IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| PACIFIC LIFE INSURANCE COMPANY LTD., | ) ) | |
| Plaintiff, | ) | (WO) |
| v. | ) ) | Civil Action No. 2:03cv838-A |
| LIBERTY MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I. INTRODUCTION**

This Plaintiff, Pacific Insurance Company, LTD ("Pacific"), seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 (Count I), contribution (Count II), and indemnity (Count III) against the Defendant, Liberty Mutual Insurance Co. ("Liberty").

Both parties previously moved for summary judgment in their favor as to all claims. At the oral argument held on the cross motions for summary judgment, Pacific's attorney specifically agreed that if the injured party in the underlying case was contributorily negligent, Pacific would not be due to be wholly reimbursed by Liberty. This court determined, however, that it could not make a factual finding as to the issue of contributory negligence on the basis of the record, and set the case for an evidentiary hearing. See Order of March 8, 2005 (Doc. #62).

The evidentiary hearing was held in this case on July 6, 2005. Based on the record and briefs filed in support of and in opposition to the Motions for Summary Judgment, and the testimony presented at the evidentiary hearing, the court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

In 1996, Safe Seal, a specialty contractor which performs in-line repair of leaks in piping and conduit in industrial settings, entered into a contract with Gulf States Paper Company ("Gulf States") to repair steam and chemical leaks in Gulf States' paper mill in Demopolis, Alabama. Under this contract, Safe Seal was to indemnify, defend, and hold harmless Gulf States. The indemnity provision of the contract states the following:

> Contractor agrees for itself and its insurers to indemnify, defend and hold harmless Owner . . . from and against any and all liabilities, claims, losses, damages, penalties, cost or expenses (including but not limited to Court costs and reasonable attorney's fees) for damage to property of what so ever kind or nature or injury to persons (including but not limited to death) arising out of or in connection with the performance of the work by Contractor, its agents, independent contractors, subcontractors, vendors, and each of their agents, officers or employees, whether or not it is caused in part by any indemnitee. Contractor's obligations under this indemnity shall not extend to property damage or personal injury caused by the sole negligence of any indemnitee or its agents.

Plaintiff's Exhibit A to Motion for Summary Judgment ("Plaintiff's Exhibit A"), Attachment 2, p. 12. Additionally, Safe Seal agreed to maintain commercial general liability insurance pertinent to the services to be performed under the contract with Gulf States, and to add Gulf States as an "additional insured" under Safe Seal's liability policy. Safe Seal had a policy with Pacific. Safe Seal made Gulf States an additional insured under its policy with Pacific by endorsement on September 1, 1995. Plaintiff's Exhibit B to Plaintiff's Motion for Summary Judgment ("Plaintiff's Exhibit B"), Attachment 3.

On February 7, 1996, Safe Seal's employee, Marvin Leon Mitchell ("Mitchell") met with David Tait ("Tait"), Maintenance Superintendent Assistant of Gulf States, concerning the repair of a leaking drain pipe which led from the de-aerator tank at Gulf States' paper mill in

Demopolis, Alabama. The pipe had been damaged by freezing conditions and had been temporarily patched by a mechanical contractor. Mitchell testified that on the day he examined the temporarily patched leak, there was water coming out of the pipe at the leak and water vapor coming off of the pipe.

Billy Fleming ("Fleming"), Assistant Superintendent at Gulf States, testified at the evidentiary hearing held in this case that steam was used in the de-aerator tank to de-aerate de-mineralized water brought into the plant from a river. The tank also contained re-captured steam in the form of warm water, or condensate. The water flowed from the tank to the boiler and in doing so also passed through a heater. The leak was in a separate line which led from the de-aerator tank.

Before the repair was performed by Mitchell, the control room was ordered by Fleming to turn the steam pressure off to the de-aerator tank. Fleming testified that he observed vents at the top of the tank and that once steam no longer emitted from those vents he notified the people who were with Mitchell, but did not speak to Mitchell directly, that the steam was off. The Gulf States' representatives who testified all agreed that there was no way to know the exact temperature of the water in the de-aerator tank once the steam was removed and that no tests were conducted to test the temperature of the water.

Mitchell testified that he was told that Gulf States could block the steam off the line, and that the water would be at ambient temperature and only subject to head pressure. Mitchell testified, however, that he did not know what temperature "ambient temperature" would be once the steam was blocked. He also testified that he was told the water would be safe enough to work on once the steam was blocked.

3

There was a significant amount of conflict in the evidence as to what Mitchell was told. During the trial it was pointed out that Mitchell never testified in his deposition that he was told that the water would be ambient temperature, only that it would be safe to work on. Tait testified that he told Mitchell the temperature would be 185 degrees at a minimum, but that there was no way to tell what the exact temperature was.  The workers' compensation claim investigator testified at the evidentiary hearing that Mitchell told him that he had been told that the temperature would be between 160 and 200 degrees, although Mitchell testified that he did not recall telling the investigator that.

On February 8, the day after his initial examination, Mitchell returned to Gulf States to perform the repair.  At that time, the water vapor was still coming off the leak in the pipe. When Mitchell began the repair, he was burned on his lower legs. The evidence was disputed as to whether there was any steam involved, but it is undisputed that the contents of the leaking drain pipe burned Mitchell and that he received second and third degree burns.  Fleming testified that he was surprised Mitchell was burned.

At the time of the incident, Mitchell wore a raincoat which extended past his knees, a face shield, safety glasses, and leather gloves. He also wore fire retardant pants and ankle boots, but did not wear the rubber pants and boots which had been provided to him and which were in the Safe Seal truck.  Mitchell testified that he was later reprimanded for not wearing the full safety suit, although he attributed that reprimand to his company wanting to continue to receive business from Gulf States.  He also testified that he would have dressed differently had he been told that the water might be between 160 and 200 degrees, and stated that he would have used a different sealing compound.  Mitchell conceded at the hearing that had he been wearing the

rubber pants and boots which he left in his truck, he would not have been burned. Mitchell was not burned in the areas of his body covered by the trench coat, face shield, or gloves.

A.S. Tatum ("Tatum"), Maintenance Foreman at Gulf States, testified at the evidentiary hearing that the additional gear Mitchell chose not to wear might not have been 100% effective against steam, but it would have offered a great deal of protection. He further testified that even assuming that a person who was going to perform a line repair was told that there would be no pressure other than head pressure and that the water would be safe to work with, he would still expect him to wear rubber pants and boots because you do not know what to expect in working on water lines. Safe Seal and its employees were the experts Gulf States hired and he would have assumed that Mitchell would use all available protective gear in doing his work.

In the latter part of 1996, Mitchell and his wife brought a lawsuit against Gulf States and Tait based on his injuries, in the Circuit Court for Marengo County, Alabama. Pacific assumed the defense of Gulf States pursuant to the insurance contract which covered Safe Seal's liability to Gulf States. Pacific called on Gulf States' own liability insurer, Liberty, to take over the defense and to participate in settlement, but Liberty refused. The case was ultimately settled by Pacific.

A. Full Indemnity of Pacific by Liberty

Under Safe Seal's policy with Pacific, Pacific agreed to "pay those sums that the insured becomes legally obligated to pay as damage because of 'bodily injury' or 'property damage' to which this insurance applies." Plaintiff's Exhibit B, Attachment 3 at page 1. The policy also included an exclusion which addressed contractual liability. This exclusion states the following:

> **Contractual Liability**
> "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
> > (1) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or
> > (2) That the insured would have in the absence of the contract or agreement.

Id. This provision generally excluded from coverage liability for bodily injury for which the insured, Safe Seal, is obligated to pay due to the assumption of liability in a contract or agreement but made an exception for contracts or agreements that were "insured contracts." An insured contract, as defined in the Pacific policy, is the following:

> "Insured contract" means:
> > . . .
> > That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Id. at pages 7-8.

Safe Seal's policy with Pacific also included terms and conditions applicable to the coverage provided under the policy to additional insureds, such as Gulf States. One of those provisions is an exclusion for "Bodily injury" or "property damage" arising out of any act or omission of the additional insured, other than the general supervision of work performed for the additional insured. Id. at page 10-11.

Gulf States also was insured separately for commercial liability under a policy issued by Liberty.

6

In ruling on previously-filed cross motions for summary judgment, this court concluded that the indemnification agreement between Gulf States and Safe Seal is an "insured contract" under the terms of the Pacific policy because it is part of the general contract between Safe Seal and Gulf States regarding Safe Seal's work at the paper mill.  See Plaintiff's Exhibit A, Attachment 2.  It, therefore, falls within the "insured contract" exception to the exclusion of contractual liability, and is covered under the Pacific policy.  See Plaintiff's Exhibit B, Attachment 3, at pages 1, 8.  Therefore, Pacific's policy provided coverage for Safe Seal's agreement to indemnify Gulf States for its liability to Mitchell, unless Mitchell's injury was caused by the sole negligence of Gulf States or its agents.  As noted, Pacific has agreed in this case that, if Mitchell was guilty of contributory negligence, the sole negligence exception would not apply and Safe Seal, and in turn its insurer Pacific, would be liable under the indemnity agreement.

The parties agreed at the evidentiary hearing held in this case that the burden of proof is on Pacific to demonstrate that Mitchell was not contributorily negligent and, therefore, the injury at issue was a result of the sole negligence of Gulf States.

> A showing of contributory negligence, although it requires
>
> proof of both knowledge and appreciation of the danger, does not require proof of a voluntary affirmative exposure to the danger [as does assumption of the risk]; rather, **it merely requires proof that the plaintiff failed to exercise reasonable care**.
> [C]ontributory negligence is a matter of some fault or departure from the standard of reasonable conduct, however unwilling or protesting the plaintiff may be....

H.R.H. Metals, Inc. v. Miller ex rel. Miller, 833 So.2d 18, 27 (Ala. 2002) (alterations and emphasis in original).

Mitchell agreed in his testimony at the evidentiary hearing held in this case that to safely repair an in-service line, he needs to know the contents of the line, the temperature, and pressure. According to his testimony, Mitchell was told that steam would be removed from the tank which led to the pipe he had to repair. He was aware that the temperatures in the pipe before this step was taken were sufficiently high to create vapor around the leak. He saw vapor coming off the leak when he inspected the area the day of the repair.

Even accepting Mitchell's trial testimony that he was not told a specific temperature of the contents of the line, but was instead told the water would be at ambient temperature, Mitchell testified that he did not know what "ambient temperature" was. Further, accepting his deposition testimony that he was told the water would be safe to work on, the court has not been provided evidence that Mitchell told anyone making such a representation what safety gear he planned to wear during the repair. In fact, Fleming testified that he would expect a Safe Seal technician to wear all safety equipment provided to him. Tait testified that he did not see that Mitchell was not wearing rubber boots when he began his repair. Tatum testified that he thought it would be reasonable to wear protective clothing, considering that unexpected things can happen during repairs of water lines.

The law in Alabama is that merely because safety equipment is available and wearing that equipment would have avoided the injury, it does not necessarily follow that a person not using the equipment was contributorily negligent. See, e.g., Jones v. Power Cleaning Contractors, 551 So.2d 996 (Ala. 1989) (even where employee admitted that had he been wearing a face shield he would not have been injured, contributory negligence requires a showing that he appreciated the danger). Under the facts of this case, however, the court must

conclude that Pacific has failed to show that Mitchell was acting reasonably when he decided not to wear the full complement of safety gear available to him, considering the demeanor of the witnesses and all of the evidence presented at the evidentiary hearing, including Mitchell's knowledge of the potential danger posed by working on a line which contained heated water under pressure, and Mitchell's testimony that he was not told a specific temperature which would be achieved by removing steam pressure from the line.

      Pacific argued at the evidentiary hearing that Mitchell could not have been contributorily negligent because no one knew the temperature of the water in the pipe, and if Gulf States, with superior knowledge, did not know the temperature, then Mitchell could not be held responsible for failing to appreciate the danger of the temperature in the pipe. There was evidence at the evidentiary hearing that Mitchell was given an estimate that the water temperature would be at least 185 degrees, or that he was told that it would be between 160 and 200 degrees. Even accepting that Mitchell was not given a temperature estimate, however, in describing to Mitchell the condition of the contents of the pipe after the steam was removed, Gulf States did not have superior knowledge as to the safety gear Mitchell planned to wear. There was no evidence presented at the evidentiary hearing that Mitchell told any Gulf States' employees who told him that the pipe would be safe to work on that he was not planning to wear his rubber pants and boots. In addition, there was evidence at the evidentiary hearing including testimony from Gulf States as to the unpredictable nature of work on water pipes, Mitchell's testimony as to his knowledge that his was dangerous work, and evidence that a reprimand was issued to Mitchell by Safe Seal for failing to wear all of his safety gear, that indicates that a reasonable person would have appreciated the potential danger. Considering all of the testimony presented at the

9

evidentiary hearing, including the demeanor of the witnesses, the court finds that a reasonable person would have appreciated the danger and would have worn rubber pants and boots in addition to the safety gear Mitchell chose to wear.  The court concludes, therefore, that because Pacific has not met its burden to demonstrate that a reasonable person in Mitchell's situation would not have worn rubber pants and boots, Pacific is not entitled to full indemnity from Liberty.

## B. Contribution by Pacific

The court now turns to the argument raised at the motion for summary judgment stage by Pacific that, by virtue of sharing provisions of its policy, it is entitled to one-half of its defense and settlement costs under the doctrine of equitable subrogation.  Pacific contends that this is so because Gulf States was an additional insured under the Pacific policy, and also because Gulf States was primarily insured by Liberty in its own policy in addition to its coverage by Pacific, so that both should share in the expense.

Pacific's argument is based on the additional insured endorsement of the Pacific policy. The endorsement states that any person or organization to which the named insured is obligated to provide insurance is an additional insured under the policy, but only with respect to liability arising out of "'your work' for the additional insured(s) or for which a governmental entity has a permit.  Plaintiff's Exhibit B, Attachment 3, page 10.  Pacific argues that because Gulf States was sued by Mitchell for injuries Mitchell sustained while working for Safe Seal, Gulf States is an additional insured under the policy.[1]

---

[1] Pacific alternatively argues that it is due full reimbursement because Gulf States would not have been covered under the additional insured provision as it excludes coverage except for injuries arising out of acts which are the general supervision of work performed for the

Liberty states that Alabama law would provide for contribution if Gulf States were merely an additional insured and there was no indemnification agreement at issue. Because there is a contractual obligation assumed by Safe Seal and covered under Safe Seal's policy with Pacific, however, Liberty argues that that agreement is dispositive of the parties' responsibilities. Liberty argues that Gulf States received benefits under the Pacific policy as an indemnitee, but that the coverage was extended under the insurance policy to Safe Seal, so that the co-insurance provision as to Gulf States as an additional insured has no application.

The indemnity agreement at issue states that Safe Seal will hold Gulf States harmless even if injury is caused as a result of actions by Gulf State, as long as the injury is not due to the sole negligence of Gulf States. In other words, Safe Seal contractually agreed to be wholly responsible for the loss even if it were partially caused by Gulf States. To require Gulf States' separate insurer, Liberty, to be partially responsible for the loss would be inconsistent with the indemnity agreement.

In <u>American Indemnity Lloyds v. Travelers Property & Casualty Ins.</u>, 335 F.3d 429 (5th Cir. 2003), a subcontractor's employee sued for injuries which were within the scope of an indemnity agreement between the subcontractor and the contractor. The subcontractor was an insured under a policy which named the contractor as an additional insured. The contractor had a separate policy as well. The insurance company which primarily insured the subcontractor

---

additional insured. <u>See</u> Plaintiff's Exhibit B, Attachment 3, at page 11. No evidence to support such a theory was presented at trial. There is no stipulation or evidence in the record of this case as to what acts by Gulf States may have contributed to Mitchell's injuries. The court finds, therefore, that there is no coverage under the additional insured provision, but that finding does not entitle Pacific to reimbursement from Liberty, because the indemnity agreement places liability on Safe Seal, Pacific's insured, to indemnify Gulf States.

11

paid a settlement and sought contribution from the insurance company which insured the contractor.

The court examined the "other insurance" clause and agreed that under the general rule where two liability insurance policies issued by different insurers provide primary coverage to the same insured, one insurer is entitled to recover from the other for the excess paid. Id. at 435. The Fifth Circuit noted, however, that that rule is subject to an exception routinely applied by courts in situations such as that which occurs in the construction industry: "where the policy of the insurer seeking to invoke the 'other insurance' clauses also covers another insured who is liable to indemnify the insured in the policy of the other insurer," the indemnity agreement may shift the entire loss notwithstanding the other insurance clause in the policy. Id. at 436.  The Fifth Circuit examined cases from other jurisdictions with similar facts and found this to be consistent analysis in the case law, including a decision from the Eighth Circuit, Wal-Mart Stores Inc. v. RLI Ins. Co., 292 F.3d 583, 588-94 (8th Cir. 2002), and a decision of the former Fifth Circuit, apparently applying Florida law, Aetna Insurance Co. v. Fidelity & Casualty Co. of New York, 483 F.2d 471 (5th Cir. 1973).[2] Id. at 437, 439. The court concluded that the indemnity agreement had controlling effect over any other insurance clause. Id. at 436. This court agrees with the reasoning of American Indemnity Lloyds and finds that such a rule would also be applied under Alabama law.

This court has found in the instant case that Pacific's insured, Safe Seal, was bound to indemnify Gulf States under the indemnity agreement because Pacific has failed to establish by a

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

preponderance of the evidence that the injury to Mitchell was caused by the sole negligence of Gulf States.  Accordingly, the indemnity agreement controls and Pacific is bound to bear the costs of settlement, irrespective of any "other insurance" clause in Pacific's policy or Liberty's separate insurance agreement with Gulf States.  A contrary conclusion "would render the indemnity contract between the insureds completely ineffectual and would obviously not be a correct result, for it is the parties' rights and liabilities to each other which determine the insurance coverage; the insurance coverage does not define the parties' rights and liabilities one to the other." Chubb Ins. Co. of Canada v. Mid-Continent Cas. Co., 982 F. Supp. 435, 438 (S.D. Miss. 1997).

### III. CONCLUSION

The court concludes that Pacific has failed to establish that its insured, Safe Seal, was not bound to wholly indemnify Gulf States under the indemnity agreement with Gulf States because Pacific has failed to establish by a preponderance of the evidence that the injury to Safe Seal's employee, Mitchell, was caused by the sole negligence of Gulf States. The court finds in favor of the Defendant and against the Plaintiff.  A separate Judgment will be entered in accordance with these Findings of Fact and Conclusions of Law.

Done this 28th day of July, 2005.

/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE